Manchester Family Division
No. 2011-734

## IN THE MATTER OF MARY BETH LAROCQUE AND GEORGE W. LAROCQUE

Argued: June 14, 2012
Opinion Issued: August 31, 2012

*Bussiere & Bussiere, P.A.*, of Manchester (*Emile R. Bussiere, Jr.* on the brief and orally), for the petitioner.

*Law Office of Donald A. Kennedy*, of Manchester (*Donald A. Kennedy* on the brief and orally), for the respondent.

CONBOY, J. The respondent, George W. LaRocque (Father), appeals an order of the 9th Circuit Court — Manchester Family Division (*Gordon*, J.) finding him in contempt for failure to pay child support, calculating his arrearages to be $102,845.52 as of December 20, 2010, and modifying his child support obligation with an effective date of January 7, 2011. We affirm in part, reverse in part, vacate in part, and remand.

The following facts are drawn from the record. The Father and the petitioner, Mary Beth LaRocque (Mother), divorced in February 2000. The divorce decree incorporated their permanent stipulation and uniform support order, and required the Father to "pay child support for their two children in the amount of $3,593 per month, alimony of $1,500 per month for six years, and continue to provide medical coverage for the children." The Mother was awarded the marital homestead, but was required to execute a

promissory note and a mortgage in favor of the Father in the amount of $18,000 to be paid upon sale of the property or the youngest child reaching age twenty-two. The Father subsequently remarried and his second wife died in October 2010. Following her death, he received $500,000 in life insurance proceeds.

I

On November 8, 2010, the Mother filed a petition for contempt, alleging that the Father had failed to pay the full child support ordered, and had unilaterally reduced his child support payment when their oldest child turned eighteen. The Father objected, arguing that the parties had agreed to waive child support arrearages and to modify child support. He also moved to modify his child support obligation.

After a hearing, the trial court found that the parties never entered into such an agreement and held the Father in contempt. The court determined that arrearages as of December 20, 2010, totaled $102,845.52. The court granted the Father's request to modify child support because their oldest child turned eighteen on June 22, 2010, and was no longer in school, which "constitutes a substantial change in circumstances warranting modification of child support," and set January 7, 2011, the date the Father moved to modify child support, as the effective date of the modification. The Father now appeals.

On appeal, the Father argues that the trial court erred in finding him in contempt because the parties had agreed to waive child support arrearages and reduce child support. He further contends that even though this agreement was not approved by the court, it is not rendered unenforceable by our decision in *In the Matter of Laura & Scott*, 161 N.H. 333 (2010). Whether parties have entered into a contract is a factual question to be determined by the trial court. *Glick v. Chocorua Forestlands Ltd. P'ship*, 157 N.H. 240, 252 (2008). Accordingly, we will not disturb the trial court's determination that the Mother and the Father did not agree to waive arrearages and reduce child support unless it is lacking in evidentiary support. *Guri (Cushing) v. Guri*, 122 N.H. 552, 555 (1982).

The Father argues that the trial court's findings are not supported by the evidence and that the Mother's acceptance of a check for an amount less than the court-ordered child support "clearly establishes a mutual meeting of the minds." At the hearing, however, the Mother testified that she never agreed to waive any amounts due for past child support, and that she never agreed to modify the amount of child support. Although the parties presented conflicting evidence on the issue of whether there was such an agreement, the evidence was sufficient to support the trial court's

finding that they did not have a contract. *See In the Matter of Henry & Henry*, 163 N.H. 175, 181 (2012) (conflicts in evidence are for the trial court to resolve). Moreover, the trial court correctly observed that even if the parties had entered into an agreement to modify the child support amount, such an agreement would be unenforceable absent court approval. *See Scott*, 161 N.H. at 336-37.

■ Alternatively, the Father argues that "[t]he defense of laches prevents the finding of the arrearages as [the Father] was prejudice[d] and the delay was unreasonable." "Laches is an equitable doctrine that bars litigation when a potential plaintiff has slept on his rights." *Premier Capital v. Skaltsis*, 155 N.H. 110, 118 (2007) (quotation omitted). Laches is not a mere matter of the elapsing of time, but is principally a question of the inequity of permitting the claim to be enforced. *See id.* When the delay in bringing suit is less than the applicable statute of limitations period, laches will bar suit only if the delay was unreasonable and prejudicial. *Id.* "We consider four factors in our analysis: (1) the knowledge of the plaintiffs; (2) the conduct of the defendants; (3) the interests to be vindicated; and (4) the resulting prejudice." *Thayer v. Town of Tilton*, 151 N.H. 483, 486 (2004) (quotation omitted). The trial court has broad discretion in deciding whether the circumstances justify the application of laches; we will not overturn its decision unless it is unsupported by the evidence or erroneous as a matter of law. *See id.*

■■ The party asserting laches bears the burden of proving both that the delay was unreasonable and that prejudice resulted from the delay. *Id.* The trial court determined that the Father did not satisfy his burden. On appeal, the Father asserts that "if the Supreme Court finds that the *Scott* case prevents the parties from having an agreement not approved by the Court, then the defense of laches should be afforded to the defendant." As we explained above, the trial court found that there was no agreement. To the extent that the Father argues that, even absent an agreement, the facts support the defense of laches, his argument as to prejudice is essentially limited to the bare assertion that "seven years later [the Mother] complains about the fact that she is receiving [less child support than the court ordered]." The trial court, however, found no prejudice sufficient to justify the application of laches, and we agree. *See id.* at 486 (explaining that the defendant's interest in timely addressing the substance of a lawsuit alone is insufficient to support a finding of prejudice for purposes of the defense of laches).

## II

The trial court granted the Father's request to modify child support. Under the child support guidelines, in calculating the amount of child support the trial court begins with the parties' respective gross incomes. RSA 458-C:2, IV (2004); RSA 458-C:3 (Supp. 2011). "Gross income" is defined as:

> all income from any source, whether earned or unearned, including, but not limited to, wages, salary, commissions, tips, annuities, social security benefits, trust income, lottery or gambling winnings, interest, dividends, investment income, net rental income, self-employment income, alimony, business profits, pensions, bonuses, and payments from other government programs . . . including, but not limited to, workers' compensation, veterans' benefits, unemployment benefits, and disability benefits . . . .

RSA 458-C:2, IV. The trial court determined that the $500,000 in life insurance proceeds from the death of the Father's second wife falls within the statutory definition of gross income and included it in calculating the modified child support amount. On appeal, the Father argues that, as a matter of law, life insurance proceeds should not be included in his gross income.

Whether life insurance proceeds fall within the definition of gross income is a question of law, which we review *de novo*. *In the Matter of Albert & McRae*, 155 N.H. 259, 262 (2007). We are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *In the Matter of Fulton & Fulton*, 154 N.H. 264, 266 (2006). We first examine the language of the statute, and, where possible, ascribe the plain and ordinary meanings to the words used. *Id.*

██ Life insurance proceeds are neither specifically included in the statutory definition of gross income, nor expressly excluded. The use of the phrase "including, but not limited to" in the statute limits the application of the statute to the types of items therein particularized. *Id.* at 267. We have explained that the items particularized in the statutory definition of "gross income" share two characteristics. *Id.* "First, all of the items listed involve payments in the form of money" as opposed to "items that, although they may carry value, are not monetary." *Id.* Second, the items listed "are all things to which the recipient, generally speaking, has a legally enforceable right and which the provider has a legal obligation to give." *Id.*

The trial court gave several reasons for its decision. First, it explained that life insurance proceeds have the same two characteristics as the other items enumerated in RSA 458-C:2, IV, stating "[t]he proceeds in the form

of money were in fact paid over to the [Father] and he would have had an enforceable right to compel the payments." The trial court also noted that "unlike other sources of income, life insurance proceeds are not specifically excluded by the statute." Finally, citing *In the Matter of State & Taylor*, 153 N.H. 700 (2006), the trial court noted that:

> Although there was no evidence presented as to the details of the underlying insurance contract or how it was funded, for purposes of the definition of gross income, there appears to be little difference between an insurance contract and an annuity or trust income, both of which are included within the definition, and similar to life insurance, might condition a payout upon a particular event occurring. Life insurance is also utilized for investment purposes and proceeds characterized as investment income are included in the definition. Although in this case the insurance proceeds were paid in a lump sum, the court has specifically held that this method of payment, rather than in some periodic fashion, does not preclude a finding that it is income.

We agree with the trial court.

■ The statutory definition of gross income is broad; it is not limited to wages and wage equivalents, *In the Matter of Jerome & Jerome*, 150 N.H. 626, 629 (2004), and it encompasses both earned and unearned income, RSA 458-C:2, IV. Gross income also includes nonrecurring income. *In the Matter of Feddersen & Cannon*, 149 N.H. 194, 197 (2003). Moreover, life insurance proceeds can be paid in various ways, including lump sum payments and periodic annuity-type distributions. *See* B. HARNETT & I. LESNICK, APPLEMAN ON INSURANCE 2D §180.13, at 578-81 (2006). Those that are paid essentially as annuities would fall within the plain language of the definition of gross income. *Jerome*, 150 N.H. at 629 ("Plainly, annuities are listed in the statute. . . . [We cannot] presume that, when the legislature used the word 'annuities' it intended to refer to certain annuities and not others."). The mere fact that the proceeds in this case were paid in a lump sum is insufficient to justify excluding them from the definition of gross income. For the same reasons we explained in *Taylor*, 153 N.H. at 704, with regard to personal injury settlements, it would not make sense for two similarly situated child support obligors who both receive life insurance proceeds to have substantially different child support obligations based merely upon the means by which they receive the proceeds. We, therefore, conclude that the definition of gross income in RSA 458-C:2, IV encompasses life insurance proceeds.

Finally, the Father argues that the trial court erred in setting January 7, 2011, the date on which he requested that child support be modified, as the

effective date of the modification. He asserts that based upon the orders that were in effect at the time of the parties' divorce, the effective date of the modification should be June 22, 2010, the date on which his daughter turned eighteen and was no longer in school. He relies upon paragraph SO-4B, a provision of the parties' Uniform Support Order — Standing Order, which states: "The amount of child support shall be recalculated in accordance with the guidelines whenever there is a change in the number of children for whom support is ordered, effective the date of the change."

■ At the time the parties divorced, RSA 458:35-c (1992) governed. Thus, in light of our decision in *In the Matter of Nicholson & Nicholson*, 164 N.H. 105 (2012), we agree that the effective date of the modification should be June 22, 2010. Accordingly, we vacate the court's order and remand for the court to recalculate the Father's on-going child support obligation, as well as his arrearages, in light of this opinion. We note that the Father had not received the life insurance proceeds as of June 22, 2010. We leave to the trial court the determination as to how the receipt of the life insurance proceeds affects the Father's support and arrearage obligations.

*Affirmed in part; reversed in part; vacated in part; and remanded.*

DALIANIS, C.J., and HICKS, J., concurred; GALWAY, J., retired, specially assigned under RSA 490:3, concurred.